# In the United States Court of Federal Claims

No. 22-648
Filed: November 15, 2022[†]
***(SEALED)***

| |
|---|
| **SYSTEMS IMPLEMENTERS, INC.,** |
| *Plaintiff,* |
| **v.** |
| **THE UNITED STATES,** |
| *Defendant,* |
| **and** |
| **OM GROUP, INC.,** |
| *Intervenor-Defendant.* |

*David S. Black* and *Gregory R. Hallmark,* with *Amy L. Fuentes* and *Danielle R. Rich*, Holland & Knight LLP, Tysons, Virginia, for Plaintiff.

*P. Davis Oliver*, Senior Trial Counsel, with *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., *Major Alissa J. K. Schrider*, Acting Chief, Field Support Branch and *Heidi Fischer*, Attorney-Advisor, Acquisition & Fiscal Law Division, U.S. Air Force, for Defendant.

*Eric A. Valle*, with *Matthew E. Feinberg, Katherine B. Burrows,* and *Jacqueline K. Unger*, PilieroMazza PLLC, Washington, D.C., for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

---

[†] This Order was originally filed under seal on October 28, 2022, (ECF No. 48). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. The proposed redactions were filed on November 14, 2022, (ECF No. 50) and are accepted by the Court. Thus, the sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

This bid protest considers whether the United States Air Force ("Air Force") erred when it awarded OM Group, Inc. ("OM Group") an information technologies support services contract at Hill Air Force Base, Utah. Systems Implementers, Inc. ("Systems Implementers"), a disappointed offeror, challenges the United States on two core issues. First, whether the Air Force improperly awarded the other offerors, OM Group and Transcend Technological Systems, Inc. ("Transcend"), strengths for corporate experience with management of a data center, technologies, and cyber risk management. Second, whether the Air Force failed to comply with the Solicitation's evaluation criteria regarding onboarding and technology capabilities. Systems Implementers requests declaratory relief providing that the Agency's award lacks a rational basis and is otherwise unreasonable, arbitrary and capricious, and contrary to applicable law and regulation. Lastly, Systems Implementers seeks a permanent injunction requiring (1) the Air Force to reevaluate proposals, (2) OM Group to stop performance, and (3) termination of the award to OM Group. The Court finds that the Air Force's determination fell squarely within the zone of reasonable decisions in reviewing and deciding awards based on a best-value tradeoff. In this case, the Air Force's best-value determination did not lack a rational basis.

Accordingly, the Court denies Systems Implementers' Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 40), and grants the United States' and OM Group's Cross-Motions for Judgment on the Administrative Record. (Def.'s xMJAR, ECF No. 43; Int.-Def.'s xMJAR, ECF No. 42).

## I.    Background

The procurement at issue involves information technology engineering, design, security, and support services for the Hill Enterprise Data Center ("HEDC") at Hill Air Force Base in Utah. (Administrative Record "AR" 364, ECF Nos. 30–39).[1] The Solicitation,[2] issued on January 23, 2020, called for "Sustainment, Modernization, and Consolidation" of the HEDC and sixteen other "Portable Operating Data Centers" in the HEDC network. (AR 359, 364). That network hosts over 2,000 physical and virtual servers for over 250 applications. (AR 364). The Solicitation's Performance Work Statement ("PWS") defined the scope of work:

> The scope of this contract is to provide engineering, continual architecture design and sustainment, application onboarding, operations support, and program/project management services to continue HEDC Lifecycle support and evolve the HEDC's current application hosting Platform-as-a-Service (PaaS), Software-as-a-Service (SaaS), traditional and cloud native application onboarding, architecture design, engineering modernization, and quality and configuration management in both the classified and unclassified enclaves.

(*Id.*).



[1] The Administrative Record, (ECF Nos. 31–39), is consecutively paginated, thus the Court will cite to the record using "(AR __)."

[2] Request for Proposal No. FA8201-20-R-0005.

The Solicitation stated the Air Force would make a single award based on a best-value tradeoff. (AR 459–60). The Solicitation further explained that the Air Force would evaluate the value of proposals based on its "integrated assessment" of two factors: Technical and Price. (AR 460). The Solicitation stated that Factor 1, the Technical evaluation, would consist of five subfactors of approximately equal importance. (*Id.*). Factor 1 would involve both a Technical Rating and a Technical Risk Rating, also of equal importance. (*Id.*). The Technical Rating considered strengths and deficiencies of proposals, while the Technical Risk Rating included only consideration of whether a flaw in the proposal either "increases" or "appreciably increases" the risk of unsuccessful performance. (*Id.* (*see* definitions of "Weakness" and "Significant Weakness")). These ratings were applied to each of the five Technical subfactors: (1) Scenario 1 – Onboarding and Technology Capabilities; (2) Scenario 2 – Program and Configuration Management; (3) Corporate Experience; (4) Transition Plan; and (5) Cybersecurity. (*Id.*).

The Air Force assigned Subfactors 1–3 Technical Ratings ranging from "Unacceptable" to "Outstanding" based on the "quality of the offeror's technical solution" to the Air Force's requirement:

**Technical Ratings:**

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength. |
| Green | Acceptable | Proposal indicates an adequate approach and understanding of the requirements. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable. |

(AR 461). Those first three Subfactors were also assigned Technical Risk Ratings ranging from "Unacceptable" to "Low" risk:

**Technical Risk Ratings:**

| Adjectival Rating | Description |
|---|---|
| Low | Proposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |

| Moderate | Proposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance.  Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
|---|---|
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of schedule, increased cost or degradation of performance.  Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |
| Unacceptable | Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level. |

(AR 461–62). Subfactors 4 and 5 were assigned either "Acceptable" or "Unacceptable" Technical Ratings and Technical Risk Ratings based on whether the proposal met the requirements of the Solicitation:

**Acceptable/Unacceptable Ratings:**

| Adjectival Rating | Description |
|---|---|
| Acceptable | Proposal meets the requirements of the solicitation. |
| Unacceptable | Proposal does not meet the requirements of the solicitation. |

(AR 462). The evaluation of the Technical Factor and its five subfactors was "significantly more important than price." (AR 460).

The first two Subfactors presented hypothetical scenarios; proposals would be evaluated based "on the degree to which the offeror demonstrates a comprehensive and in-depth approach to the scenario requirements[.]" (AR 462–63). For example, Subfactor 1 required offerors to onboard a software application called "SystemX" to the data center. (AR 454). The Solicitation stated the Agency would evaluate the offerors' approaches to providing a solution overview, a project plan summary, a project schedule, a bill of materials summary, and a risk management summary. (AR 463). As mentioned above, the offerors' approaches to the two hypothetical scenarios in Subfactors 1 and 2 were assigned a Technical Rating from "Unacceptable" to "Outstanding." (AR 461).

Subfactor 3—"Corporate Experience"—focused on "the degree to which the offeror's examples of corporate experience within the last five years demonstrates depth and breadth of experience" in five areas: (1) Management of a Data Center; (2) Onboarding of Legacy Applications; (3) Technologies used; (4) Risk Management; and (5) Cybersecurity. (AR 464).

The Air Force initially awarded the contract to Transcend in June 2020. (AR 6070–79). Systems Implementers and OM Group protested at the Government Accountability Office ("GAO"). (AR 12673). In response, the Air Force took corrective action which included terminating the award, reevaluating proposals, and making a new source selection decision. (*Id.*). While the Air Force was doing so, Systems Implementers filed a second GAO protest challenging the adequacy of discussions and the Air Force's limitations on proposal revisions. (AR 12673–74). The GAO dismissed the second protest as premature. (AR 12674).

The Air Force reevaluated each offeror's proposals on each of the five Technical subfactors. For Subfactor 1, involving the first hypothetical scenario, Systems Implementers, OM Group, and Transcend all received Acceptable/Low Risk ratings. (AR 9906–07). Systems Implementers received no strengths and one weakness, which the Air Force concluded was "minor." (AR 9843). OM Group received no strengths and two weaknesses, which the Air Force also concluded were "minor." (AR 9798). Transcend received no strengths or weaknesses. (AR 9863–64). The Air Force noted that each of these three offerors reached similar end states and there was "little overall differentiation between offerors for the technical rating[,]" despite Systems Implementers' more detailed approach. (AR 9909 (noting that Systems Implementers' more detailed approach was itself "not more advantageous to the Government" because each offeror met the end state requirement)).

For Subfactor 2, encompassing the second hypothetical scenario, Systems Implementers received an Acceptable/Low Risk rating while OM Group and Transcend both received the higher Good/Low Risk ratings. (AR 9910). The Air Force identified two strengths and no weaknesses for OM Group and Transcend. (*Id.*). The Air Force determined that Systems Implementers' proposal for Subfactor 2 presented no strengths or weaknesses. (*Id.*).

For Subfactor 3, Systems Implementers, OM Group, and Transcend all earned Good/Low Risk ratings. (AR 9913–14). Systems Implementers demonstrated two strengths for "Management of a Data Center" and "Onboarding Legacy Applications." (AR 9846–47). The Air Force awarded OM Group three strengths for "Management of a Data Center," "Technologies," and "Cyber Risk Management." (AR 9802–03). Transcend received strengths in "Technologies" and "Cyber Risk Management." (AR 9868–69). The Air Force concluded that the strengths of OM Group's and Transcend's proposals provided a greater overall benefit than Systems Implementers' proposal with respect to Subfactor 3. (AR 9919).

For Subfactors 4 and 5, Systems Implementers, OM Group, and Transcend each received "Acceptable" ratings, and the Air Force concluded there was no differentiation between the three proposals on either subfactor. (AR 9920–21). The Air Force summarized its Subfactor Technical Ratings in the following chart:

| OFFEROR | RATING | SUBFACTOR 1 | SUBFACTOR 2 | SUBFACTOR 3 | SUBFACTOR 4 | SUBFACTOR 5 |
|---------|--------|-------------|-------------|-------------|-------------|-------------|
| OMG | Technical | ACCEPTABLE | GOOD | GOOD | ACCEPTABLE | ACCEPTABLE |
| | Risk | LOW | LOW | LOW | N/A | N/A |
| | | | | | | |
| SI | Technical | ACCEPTABLE | ACCEPTABLE | GOOD | ACCEPTABLE | ACCEPTABLE |
| | Risk | LOW | LOW | LOW | N/A | N/A |
| TTS | Technical | ACCEPTABLE | GOOD | GOOD | ACCEPTABLE | ACCEPTABLE |
| | Risk | LOW | LOW | LOW | N/A | N/A |

(AR 9921). The Agency also noted that all offerors' price proposals were complete, reasonable, and balanced:

| Offerors | TEP | Complete | Reasonable | Balanced |
|----------|-----|----------|------------|----------|
| OMG | $195,171,764 | Yes | Yes | Yes |
| | | | | |
| SI | $224,274,134 | Yes | Yes | Yes |
| TTS | $194,776,490 | | | |

(AR 9923).

Following the reevaluation of proposals, the Air Force Contracting Officer ("CO") determined that OM Group's proposal offered the best overall value and awarded it the contract. (AR 12674). Although the CO found Systems Implementers' proposal "awardable, affordable and executable[,]" it was ultimately more expensive and not as highly rated as the proposals from OM Group or Transcend. (*Id.*). Thus, the CO determined that System Implementers' proposal was not in the best interests of the Air Force. (*Id.*).

The Air Force's Source Selection Authority determined that OM Group's proposal offered the best value to the government based on OM Group's relative technical strengths and low relative price. (AR 9926, 9946). The Air Force concluded that OM Group's "strength and experience in applied research and development and investment in and use of innovative technologies and federated methodologies, including automation to expedite cloud migration . . . represents greater value to the Government and warrants paying the nominal price difference" between OM Group's proposal and Transcend's proposal. (AR 9949).

After the Air Force notified Systems Implementers of the planned award to OM Group, Systems Implementers launched a size protest before the Small Business Administration. (AR 10400–11238). That protest failed, and the Air Force formally awarded the contract to OM Group on February 8, 2022. (AR 11240, 9969). Systems Implementers renewed its protest of the award before the GAO but was denied on June 1, 2022. (AR 12669–99). The parties have filed cross-motions for judgment on the administrative record. This matter is now fully briefed and ripe for a decision on the merits.

## II.    Analysis

Systems Implementers challenges the United States on two main grounds. First, Systems Implementers argues that the Air Force conducted flawed evaluations of the other offerors, OM Group and Transcend, under Subfactor 3. (Pl.'s MJAR at 19–34). Within this argument, Systems Implementers contends that (1) OM Group improperly received a strength for "Management of a Data Center," (2) OM Group and Transcend improperly received strengths for cloud migration "Technologies," and (3) OM Group improperly received a strength for "Cyber Risk Management." (*Id.*). Second, Systems Implementers argues that the Agency failed to comply with the Solicitation's evaluation criteria under Subfactor 1. (*Id.* at 34–38).

Where parties move for judgment on the administrative record, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike summary judgment standards, genuine issues of material fact do not preclude

judgment on the administrative record. *Id.* at 1355–56. Questions of fact are resolved by reference to the administrative record. *Id.* at 1356.

When presented with a challenge to a procurement award, "[t]he task of the reviewing court is to apply the appropriate [Administrative Procedure Act] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706 (the "APA")). Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Thus, judicial review of agency action under the APA proceeds on two tracks: (1) the Court might find that the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the Court could find the agency's procurement procedure involved a regulatory or statutory violation. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). When the agency's conduct fails under this standard of review, the Court must then decide if the "bid protester was prejudiced by that conduct." *Bannum, Inc.*, 404 F.3d at 1351. The protester can establish prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Id.* at 1353.

To determine whether an agency decision was arbitrary or capricious, the Court should not substitute its own judgment for that of the agency, but should determine whether it was "legally permissible, reasonable, and supported by the facts." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 551 (2017). The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Weeks Marine, Inc.*, 575 F.3d at 1371 (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This is particularly true regarding "the minutiae of the procurement process[.]" *Id.* ("matters [such] as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."); *see also Widnall v. B3H Corp.*, 75 F.3d 1577, 1580 (Fed. Cir. 1996) (the Court's role in reviewing a best value determination is to assess whether "an agency's procurement decision is grounded in reason" and complied with applicable procurement laws and regulations). However, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the decision lacks a rational basis and is "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Court is bound to the administrative record and "will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated . . . ." *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022) (quoting *IAP Worldwide Servs.*, 159

Fed. Cl. 265, 286 (2022)). The Court must be cautious of *post hoc* rationale or "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015)), *aff'd* 809 F.3d 590 (Fed. Cir. 2015).

> A. *The Air Force's evaluation of OM Group's and Transcend's proposals under Subfactor 3 was not flawed.*

Systems Implementers argues that the Air Force engaged in a flawed evaluation of its competitors' proposals under Subfactor 3. (Pl.'s MJAR at 19–34). Importantly, the Agency identified Subfactor 3 as the key distinguishing factor in the award decision to OM Group. (AR 9948 ("Subfactor 3 is what provides the differentiation in value to the Government.")). In response, Systems Implementers raises three issues related to the Air Force's evaluation criteria for Subfactor 3. First, Systems Implementers argues that the Solicitation sought experience in physical data center management, but the Agency evaluated proposals based on cloud-related experience. (Pl.'s MJAR at 20). Second, Systems Implementers argues OM Group and Transcend received strengths for "technologies" that support cloud services not listed in the Solicitation under Subfactor 3. (*Id.* at 27). Third, Systems Implementers maintains that OM Group improperly received a strength for its cyber risk management when it failed to demonstrate experience with cybersecurity. (*Id.* at 31). The Court addresses each issue in turn.

> i. The Air Force properly awarded a strength to OM Group for its experience with "Management of a Data Center."

Systems Implementers argues that OM Group should not have received a strength for its experience with "Management of a Data Center." (Pl.'s MJAR at 20). Specifically, Systems Implementers contends that the Air Force violated the terms of the Solicitation because OM Group's strength was based on managing a cloud environment, but such experience "[does] not involve a 'data center' at all" when data centers definitionally require a physical space. (*Id.*). Systems Implementers concludes that the Agency violated the express terms of the Solicitation when it awarded a strength to OM Group. (*Id.*).

The United States counters that the Air Force complied with the stated evaluation criteria because cloud migration necessarily involves a physical data center. (Def.'s xMJAR at 16). The United States also argues that governmental agencies are transitioning toward cloud services because they provide "more efficient infrastructure" and the Solicitation's terms reflected this effort to modernize. (*Id.*). The United States argues that Systems Implementers' contemporaneous understanding, when paired with the congruent understanding among its competitors, demonstrates that Systems Implementers believed cloud migration applied to data center management experience for Subfactor 3. (*Id.* at 18–19 (citing AR 9846, 8239–41, 9802, 9867). For its part, OM Group notes that the Solicitation "did not define what experience would qualify as 'Management of a Data Center.'" (Int.-Def.'s xMJAR at 21). Instead, OM Group argues, the Solicitation made clear that evaluation of corporate experience under Subfactor 3 would be tied to PWS requirements. (*Id.* at 22). Those requirements, OM Group maintains, "clearly encompass cloud migration and management of a cloud environment such that experience in those areas is intrinsic to the type of management experience" the Air Force would

evaluate. (*Id.*). Both the United States' and OM Group's arguments are persuasive while Systems Implementers' is not.

The Air Force is required to evaluate all offers according to the terms and conditions of the Solicitation. *See* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). As stated above, Subfactor 3 set forth its evaluation criteria as assessing the breadth and depth of each offeror's corporate experience with "Management of a Data Center." (AR 464). This experience was comprised of two subfactors: (a) "[t]ier of data center (Uptime Institute Data Center Site Infrastructure Tier Standard) minimum acceptability for this subfactor is Tier 1" and (b) "[m]ulti-tenancy characteristics of application and infrastructure[.]" (*Id.*).

Systems Implementers primarily relies on Office of Management and Budget Memorandum M-16-19 ("OMB memo") that is "referenced" in the Solicitation, to support its argument that a data center must have a physical component.[3] (Pl.'s MJAR at 4, 20–22). Systems Implementers argues the OMB memo defines tiered data centers under Uptime Institutes' classification system which expressly excludes cloud services. (*Id.* at 21–22). It emphasizes that "the data center must have a physical space with supporting physical infrastructure, such as a power supply, cooling system, and backup generator." (*Id.* at 22 (citing Uptime Institute's website)). Under this definition "private sector-provided cloud services" are explicitly distinct from data centers. (*Id.*).[4] Systems Implementers asserts that "tier of data center" under Subfactor 3 "is the exact same classification system announced in the Solicitation" and therefore experience with cloud migration is necessarily excluded from management of a data center. (*Id.*). Systems Implementers' argument is unconvincing.

As an initial matter, the OMB memo itself stipulated that the distinction it draws between a tiered data center and private sector-provided cloud services is specifically "for the purposes of *this memorandum* . . . ." (AR 12637 (emphasis added)). This plainly contravenes Systems Implementers' argument that the OMB memo clarifies the term "tiered data center" for purposes

---

[3] Office of Management and Budget, *Data Center Optimization Initiative*, Memorandum M-16-19 (Aug. 1, 2016) ("OMB Memo M-16-19") (*available at* https://datacenters.cio.gov/assets/files/m_16_19.pdf).

[4] OMB Memorandum M-16-19 states:

> Data centers shall be categorized into two groups: tiered data centers and non-tiered data centers. Tiered data centers are defined as those that utilize each of the following: 1) a separate physical space for IT infrastructure; 2) an uninterruptible power supply; 3) a dedicated cooling system or zone; and 4) a backup power generator for prolonged power outages. All other data centers shall be considered non-tiered data centers. Private sector-provided cloud services are not considered data centers for the purposes of this memorandum, but must continue to be included in agencies' quarterly inventory data submissions to OMB.

(Pl.'s MJAR at 15) (emphasis removed).

of the Solicitation. Furthermore, despite Systems Implementers' reliance on the OMB memo, there is no clear incorporation of its definitions in the Solicitation. (*See generally* AR 364–365). Where a protest involves the interpretation of the terms of a solicitation, it presents a question of law. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004), *aff'd* 56 Fed. Cl. 377 (2003). As with matters of contract interpretation, the Court must give the text of the solicitation its plain and ordinary meaning. *Id.* It "must interpret [the solicitation] as a whole" and in a manner that gives reasonable effect "to all parts and avoids conflict or surplusage of its provisions." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (internal quotation marks and citation omitted). The Court analyzes the terms of the solicitation by applying the principles governing contract interpretation. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997–98 (Fed Cir. 1996) (principles governing contract interpretation apply "with equal force" in interpreting solicitations).

Incorporation by reference integrates material from other documents into a "host document" by clearly citing that material so they effectively become part of the host document. *CSI Aviation, Inc. v. Dep't of Homeland Sec.*, 31 F.4th 1349, 1355 (Fed. Cir. 2022) (internal citations omitted); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 708 (2010) (applying well-established principles of contract interpretation to interpretation of government solicitations), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1342 (Fed. Cir. 2021). The Federal Circuit held that although there are no "magic words" of reference or incorporation, parties should still adopt clear language to indicate incorporation, such as "is hereby incorporated by reference" or "is hereby incorporated as though fully set forth herein." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1346 (Fed Cir. 2008) (determining other identifying information, including "title, date, parties to, and section headings of any document to be incorporated" should be present in contract); *see also Callaway Golf Co. v. Acuschnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (a "mere reference to another [document] is not an incorporation of anything therein." (internal citation omitted)).

Here, no clear language of incorporation was used. The OMB memo is not referenced or otherwise identified in the evaluation criteria section for Subfactor 3. Instead, it was mentioned only once in the PWS's Scope of Work which stated, "The Data Center Optimization Initiative (DCOI) established in OMB Memorandum M-16-19 supersedes the [Federal Data Center Consolidation Initiative] and fulfills the data center requirements of the Federal Information Technology Acquisition Reform Act (FITARA)." (AR 365). The PWS further provides that the DCOI requires agencies to develop and report data center strategies, "[t]ransition to more efficient infrastructure, such as cloud services and inter-agency shared services[,]" utilize technological advancements to improve efficiency, and provide quality services for the public. (*Id.*). Thus, the plain language of the PWS contradicts Systems Implementers' argument. It frames the memo as advocating for modernization of cloud services, rather than excluding cloud migration from data centers. As OM Group convincingly asserts, the PWS advocates for modernization and cloud migration. (Int.-Def.'s xMAR at 22).

Further, the Solicitation describes the HEDC as "comprised of world-class data centers managed by the 75 ABW/SC hosting over 2000 physical and virtual servers servicing 250+ applications." (AR 364). This language regarding physical and virtual servers does not preclude cloud services as Systems Implementers asserts. Rather, it merely indicates there is a physical

aspect to a data center. This point is not contested by the United States. (Def.'s xMJAR at 17 (labeling physical distinction between data centers and cloud environment "non-controversial[.]")). Accordingly, the United States does not challenge that "data centers are physically distinct from a cloud environment[,]" but emphasizes that throughout the Solicitation the Air Force referenced cloud migration in relation to data center management. (*Id.*). Therefore, the Solicitation was subject to the mandate to modernize and consolidate data centers which necessarily involved cloud migration as part of the management of data centers.

Systems Implementers' reliance on the OMB memo is further misplaced because the Solicitation must be read as a whole. *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 602 (2022) (citing *Banknote Corp. of Am.*, 365 F.3d at 1353 ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.") (internal citations omitted)). As described above, the PWS merely mentions the memo in the context of utilizing more efficient cloud services. (AR 365). This type of language is used throughout the Solicitation. For example, the Solicitation's section "[HEDC] Hosting Sustainment," requires contractors to engineer solutions "utilizing industry best practices . . . [which] involves re-factoring customer systems to be successfully deployed into the HEDC [Platform As a Service], a designated cloud environment, or a hybrid of the two." (AR 372). The United States correctly asserts that under the "mandate to modernize and consolidate data centers," cloud migration is linked to data center management. (Def.'s xMJAR at 17).

Systems Implementers also contends that OM Group's strength based on past cloud migration experience ran counter to the evidence before the Agency. (Pl.'s MJAR at 23). Specifically, Systems Implementers highlights that OM Group's proposal touted its "[m]anagement of a [c]loud [e]nvironment." (*Id.* (emphasis removed)). As such, Systems Implementers argues, OM Group's proposal contained no information or claims that it managed a tiered data center for the Headquarters, Department of the Army ("HQDA"). (*Id.* at 25). This argument is rooted in Systems Implementers' interpretation that tiered data centers exclude cloud services. It follows that Systems Implementers believes OM Group's experience is irrelevant and does not warrant a strength. As stated above, the Court found Systems Implementers' claim that tiered data centers exclude cloud services to be unsubstantiated. This finding renders this related argument ineffectual.

For its part, OM Group argues that it earned this strength because it demonstrated experience with both physical data centers and cloud migration in its project with the HQDA. (Int.-Def.'s xMJAR at 19). Specifically, OM Group emphasizes that cloud migration involved "transitioning hundreds of systems and applications from the Pentagon Joint Service Provider on-premises data center into a cloud environment. . . ." (*Id.* at 24 (noting appropriate strength award even under Systems Implementers' understanding of evaluation criteria)). Therefore, OM Group concludes its experience warranted a strength under management of a data center. (*Id.*).

This disputed experience was highlighted in the Air Force's Source Selection Evaluation Board's ("SSEB") final report. The report determined that OM Group's experience migrating over 150 systems to a cloud environment for the HQDA demonstrated experience exceeding requirements for data center management. (AR 9802). By asking the Court to discount OM Group's experience with cloud migration as an aspect of data center management, Systems Implementers asks the Court to substitute its discretion for that of the Agency. As the Court

previously held, "agencies retain great discretion in determining the scope of a given evaluation factor." *Harmonia Holdings Grp., LLC v. United States*, 153 Fed. Cl. 245, 255 (2021) (internal citation omitted); *Commc'n Constr. Servs., Inc. v. United States*, 116 Fed. Cl. 233, 266 (2014) ("As the Federal Circuit has recognized, challenges to the technical scoring involve the minutiae of the procurement process, discretionary determinations of procurement officials that a court will not second guess.") (internal citations and quotation marks omitted). The Court declines to do so.

Furthermore, Systems Implementers concedes that its own strength award under Subfactor 3 was granted, in part, because of its "hybrid cloud migration" experience. (Pl.'s Repl. at 15 (citing AR 9846), ECF No. 44). Systems Implementers argues its strength was awarded due to four enumerated items, only one of which addressed the cloud. (*Id.* at 15). However, such a concession indicates that Systems Implementers contemporaneously understood that the Air Force took cloud migration into account when evaluating experience managing a data center. As the Court previously stated, "[t]he integrity of the protest process does not permit a protester to espouse one interpretation or position during the procurement, and then argue during a protest that the interpretation or position is unreasonable or otherwise improper." *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 400 (2021) (internal citations omitted).

To further distinguish its own experience, Systems Implementers highlights that while previously managing the HEDC it performed tasks such as transforming a Tier I data center to a Tier IV data center. (Pl.'s MJAR at 48; Pl.'s Repl. at 15 (Tier IV data centers with same basic requirements)). Under the definition of "tiered" set forth in the OMB memo, "tiered" requires a "separate physical space for [information technology] infrastructure." (AR 12386). Accordingly, Systems Implementers is emphasizing that one facet of its experience with data center management is solely based in a physical space. However, this distinction is unavailing. Even if the bulk of Systems Implementers' experience is with management of a physical data center, that does not diminish OM Group's experience with the HQDA. OM Group's experience was still relevant and determined to be advantageous to the Government. (AR 9802). "The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation." *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008). Therefore, the Air Force's decision to award a strength to OM Group for its corporate experience with cloud migration did not violate the terms of the Solicitation.

        ii.   <u>The Air Force properly awarded strengths to OM Group and Transcend for experience with cloud migration "Technologies."</u>

Systems Implementers argues that the Air Force violated the terms of the Solicitation and acted arbitrarily and capriciously by improperly awarding strengths to OM Group and Transcend for experience with cloud-related "technologies." (Pl.'s MJAR at 27). Systems Implementers underscores that Subfactor 3 was "very specific" about which technologies qualified within the scope of corporate experience and that this list did not include cloud services. (*Id.* at 28). The United States counters the strength awards were consistent with the plain language of the Solicitation, and Systems Implementers merely "misread" that language. (Def.'s Repl. at 18, ECF No. 45). Similarly, OM Group argues that the Solicitation "identified *minimum* technologies" but did not impose other limitations on those technologies. (Int.-Def.'s xMJAR at

27) (emphasis in original). The plain language of the Solicitation does not support Systems Implementers' argument.

As stated above, all proposals must be evaluated according to the terms and conditions of the Solicitation. *See* FAR 15.305(a). Here, Subfactor 3 provided that offerors would be evaluated on the breadth and depth of each offeror's experience in "technologies used in support of the following:" (a) operating systems, (b) databases, (c) application servers, (d) virtualization, (e) storage, and (f) networking. (AR 464). Each listed area provided two or three technologies considered as "minimum acceptability for [the] subfactor[.]" The United States contends that each listed area is supported by technologies but is not a "technology" itself. (Def.'s xMJAR at 19–20). This is supported by the Administrative Record.

First, the phrase "technologies used in support of" indicates the six areas listed above are not the technologies themselves. (AR 464). As the United States convincingly illustrated, "'operating systems' is not a 'technology' under this subfactor, rather the offeror was required to demonstrate its use of technology to support operating systems." (Def.'s xMJAR at 20). The Court must, wherever possible, "giv[e] effect to the plain meaning of each word, clause or sentence." *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2011) (internal citations omitted). Here, the plain meaning of the Solicitation supports the United States' interpretation that the six enumerated items require the support of such technologies but are not the "technologies" to be evaluated. It does not support Systems Implementers' argument that there are "six technologies listed in Subfactor 3" and cloud migration was not one of the enumerated "types of technologies[.]" (Pl.'s MJAR at 29, 31).

Second, some of the technologies identified under this subfactor explicitly include cloud services. For example, the virtualization prong's minimum acceptable technologies, VMware and Microsoft, both include cloud products. (AR 464). These products are listed in the PWS which provided more detailed explanations under "Contractor Tasking Requirements." (AR 360). Regarding VMware, contractors were required to have personnel with expertise and knowledge of VMware products, including "VMWare Cloud Platform (VMC)[,]" "VMware products supporting the vCloud Air Network (vCAN) program[,]" and "VMware vRealize Suite Cloud Management Platform." (AR 377). Similarly, contractors were required to have expertise and knowledge of Microsoft products, including "Microsoft Azure," a cloud environment. (AR 376; *see* Pl.'s MJAR at 28–29 (highlighting Microsoft Azure as outside evaluation criteria)). The text of the PWS indicates the virtualization technologies included cloud-related products. *See Severson Grp., LLC v. United States*, 152 Fed. Cl. 601, 608–09 (2021) (relying on language from the PWS to interpret purpose of subfactor). Accordingly, the technologies required to support virtualization directly contravene Systems Implementers' argument that the Air Force violated the evaluation by awarding strengths to Transcend and OM Group for experience with Amazon Web Services and Microsoft Azure technologies.[5] (Pl.'s MJAR at 30).

---

[5] Before the GAO, the CO stated that "Microsoft Azure and Amazon Web Services (AWS) are technologies generally used in support of virtualization . . . because they support and enable

Systems Implementers also argues that the Air Force evaluated proposals on a different, unstated basis because the types of technology cited as advantageous to the Government were "used in sustaining and modernizing a tiered data center[.]" (Pl. MJAR at 29–30). However, "a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." *Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010)). Here, the Air Force determined the scope of "technologies" included cloud services. In the SSEB report for OM Group, the Air Force explained the depth and breadth of OM Group's experience, specifically with "migrating applications into a [c]loud environment using both Microsoft Azure and Amazon Web Services [] provides a strength in technologies skillsets and capabilities." (AR 9803). The Air Force determined this was advantageous because the cloud would likely play a role in the HEDC's future as it "anticipates increased onboarding and consolidation of customer applications and systems to a cloud environment during performance of the contract." (*Id.*). This language was echoed in the SSEB report on Transcend's experience. (AR 9868).

Systems Implementers' argument hinges on its improper interpretation of what constitutes a data center. As explained above, the terms of the Solicitation did not exclude cloud migration from data centers and their corresponding technology. When read as a whole, the Solicitation indicates that cloud "technologies" were not excluded by the Air Force because they support modernization and efforts to consolidate data centers. *See Banknote Corp. of Am.*, 365 F.3d at 1353. The Air Force's strength awards to OM Group and Transcend were consistent with the stated evaluation criteria and not arbitrary, capricious, an abuse of discretion, or otherwise contrary to applicable law or regulation.

       iii.   *The Air Force's strength award to OM Group for "Cyber Risk Management" was not arbitrary or capricious.*

Systems Implementers maintains that OM Group improperly received a strength under Subfactor 3 for its cyber risk management when it failed to demonstrate experience with cybersecurity through a Level 3 Capability Maturity Model Integration ("CMMI") certification and Information Technology Infrastructure Library ("ITIL") framework.[6] (Pl.'s MJAR at 31–32). First, Systems Implementers contends the CMMI certification is unrelated to managing cyber risk because it does not concern cybersecurity. (*Id.* at 31). Second, Systems Implementers

---

operating systems, databases, application servers, etc. to be used in a virtual cloud environment." (AR 12543).

[6] CMMI is "[a] process improvement approach that provides organization with the essential elements or effective processes that ultimately improve their performance." (AR 1064 (quoting glossary from Systems Implementers' proposal)). ITIL is "[a]n Information Technology (IT) management framework that provides practices for Information Technology Services Management (ITSM), IT development and IT operations. ITIL gives detailed descriptions of several important IT practices and provides comprehensive checklists, tasks and procedures that any IT organization can tailor to its needs." (AR 1076 (same)).

argues that OM Group's proposal framed its ITIL experience in the future tense, so the strength award "r[an] counter to the evidence" before the Air Force. (*Id.*).

The United States argues CMMI does "address an organization's cybersecurity maturity." (Def.'s xMJAR at 21). OM Group counters that CMMI reduces cyber risk through process maturity and argues Systems Implementers "misconstrue[s]" the evaluation criteria by confusing "cybersecurity" with "cyber." (Int.-Def.'s xMJAR at 28–30; Int.-Def.'s Repl. at 14, ECF No. 46). OM Group also argues its proposal used the present tense when describing its experience using ITIL. (Int.-Def.'s xMJAR at 30). The Court finds that the Air Force reasonably awarded OM Group's strength for cyber risk management.

The Court reviews agency action to determine if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). Here, Systems Implementers has failed to demonstrate that the Air Force violated the terms of the Solicitation. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (protestor with burden of proof in negotiated procurement bid protest). As recited above, for Subfactor 3 the Agency evaluated the breadth and depth of offerors' examples of corporate experience with cyber risk management. (AR 464 (specifically stating "[r]isk management in the following categories: . . . (c) [c]yber")). "Cyber" is presented as a category of risk management. This is distinct from cybersecurity, presented as its own area under Subfactor 3 – Corporate Experience, with equal importance to "[r]isk management." Therefore, they are distinct concepts and may not be used interchangeably based on the terms of the Solicitation.

Importantly, Systems Implementers confuses cyber risk management with cybersecurity. For example, in its motion, Systems Implementers argues that OM Group's CMMI certification does not address an organization's cybersecurity maturity, practices, or controls. (Pl.'s MJAR at 32). It further contends that CMMI is unrelated to an organization's "cybersecurity procedures or implementation of cybersecurity controls, much less its *experience* in managing cyber risk." (*Id.* at 27) (emphasis in original). The Oxford dictionary defines "cyber" as "[o]f, relating to, or involving (the culture of) computers, virtual reality, or the internet; futuristic." Oxford English Dictionary Online, https://www.oed.com/view/Entry/250878?rskey=y6HBxc&result=1&isAdvanced=false#eid (last visited Oct. 11, 2022). Conversely, the Oxford dictionary defines "cybersecurity" as security also relating to computers or the internet, but especially "that intended to protect against viruses or fraud." Oxford English Dictionary Online, https://www.oed.com/view/Entry/250879?redirectedFrom=cybersecurity#eid117229282 (last visited Oct. 11. 2022). The dictionary definitions demonstrate the terms are distinct. "Cyber" is more expansive encompassing computers and technology generally, whereas "cybersecurity" is specific and directly addresses the protection of computers. This distinction is key to the reasonableness of the Air Force's strength award.

Regarding Systems Implementers' first argument, the record demonstrates it was reasonable for the Air Force to determine the CMMI certification illustrated experience with cyber risk management. As the Air Force explained, CMMI is a maturity model that can gauge cyber security risk and determine an organization's preparedness to address threats. (AR 9803). Therefore, the Air Force concluded, OM Group's CMMI certification complies with and exceeds

the minimum requirements to decrease cyber risk. (*Id.*). Systems Implementers further argues there is no connection between ITIL and cyber risk management experience. (Pl.'s MJAR at 33). However, Systems Implementers fails to support this assertion with evidence. It merely spells out the acronym and states that, like CMMI, ITIL is a set of detailed practices, so it does not address cyber risk. (*Id.*). Such an explanation fails to engage with the Air Force's determination that "strong compliance assurance processes" decrease cyber risk. (AR 9803). Both determinations are within the Air Force's discretion. When the Court reviews an agency's technical evaluation, it applies "another separate level of deference, as it falls within a special category of 'discretionary determinations' that the Court 'will not second guess.'" *Ginn Grp., Inc.*, 159 Fed. Cl. at 601 (quoting *E.W. Bliss Co.*, 77 F.3d at 449)).

The United States also highlights that Systems Implementers' proposal invoked its own CMMI certification under "Corporate Experience: Cybersecurity" to demonstrate it could "manage processes, *manage risk, and integrate cybersecurity considerations into every aspect of the org[anization]*." (Def.'s Repl. at 17–18 (citing AR 8247)). Again, Systems Implementers cannot rely on one understanding of a term or phrase during the procurement and in the same breath argue that the same interpretation is unreasonable during its protest before this Court. *See IAP World Servs., Inc.*, 152 Fed. Cl. at 400. Based on the language of its proposal, Systems Implementers understood CMMI's "structured framework" helped risk management. (AR 8247). This persuasively demonstrates that Systems Implementers' contemporaneous understanding of "cybersecurity" and "cyber risk management" incorporate CMMI certification.

Systems Implementers further asserts that OM Group does not have current experience with ITIL because "it intends to use ITIL in the future." (Pl.'s MJAR at 34 (emphasis removed)). This argument hinges on the fact that OM Group said it "will" adopt ITIL framework for IT services. (AR 7804). Systems Implementers argues that this language demonstrates OM Group's proposal failed to show its experience using ITIL during the procurement process. (Pl.'s MJAR at 34). However, this cherry-picked language is unpersuasive.

The United States and OM Group convincingly contend that Systems Implementers "misread[]" OM Group's proposal to disregard its current experience with ITIL. (Def.'s Repl. at 18; Int.-Def.'s xMJAR at 30). OM Group's proposal stated, "[w]e leverage ITSM [Information Technology Service Management], such as ITIL." (AR 7804). It further stated "[w]e have successfully used our people, processes and technology to address Data Center changes . . . ." (AR 7790). This clearly demonstrates OM Group's *current* experience, not lack thereof. OM Group also argues that its proposal used the present tense when discussing ITIL. It points out that throughout its proposal it used terms such as "[w]e leverage[,]" "[o]ur team leverages ITIL/ITSM . . . ." (Int.-Def.'s Repl. at 15 (citing AR 7804)). Systems Implementers took OM Group's language out of context to challenge its experience, but the proposal indicates OM Group's intent to deploy this framework during contract performance.

The administrative record establishes that the Air Force reasonably exercised its discretion by awarding OM Group a strength for its "Cyber Risk Management. *See UnitedHealth Mil. & Veterans Servs., LLC*, 132 Fed. Cl. at 551. Systems Implementers fails to demonstrate that the award was arbitrary or capricious. *See Galen Med. Assocs., Inc.*, 369 F.3d at 1330 ("higher burden exists because the contracting officer engages in what is 'inherently a judgmental process.'"). Therefore, the Air Force properly awarded a strength to OM Group.

### B. *The Air Force's evaluation of Subfactor 1 was rational.*

Systems Implementers argues that the Air Force disregarded the evaluation standards set forth in the Solicitation under Subfactor 1. (Pl.'s MJAR at 34). Specifically, Systems Implementers claims its more comprehensive, in-depth approach to the hypothetical scenario should have received a strength because the Solicitation provided it would evaluate each proposal "on the degree to which the offeror demonstrates a comprehensive and in-depth approach to the scenario requirements[.]" (*Id.*; AR 462–63). Systems Implementers contends the Air Force instead focused on whether offerors achieved the scenario's "end state requirement[.]" (Pl.'s Repl. at 24).

The United States counters that although the Solicitation provided proposals would be evaluated on comprehensiveness, strengths are only awarded when the proposal is advantageous to the Government during contract performance. (Def.'s xMJAR at 23). The United States argues the Air Force determined that Systems Implementers' approach was not more advantageous, so it did not warrant a strength. (*Id.* at 24). Similarly, OM Group argues Systems Implementers fails to identify any detail that warrants a strength or rating above "Acceptable." (Int.-Def.'s xMJAR at 33–34). It highlights the Air Force determined such details "are not relevant or necessary for the requirements of the scenario." (*Id.* at 34 (citing AR 12564) (emphasis removed)).

"The [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). This is especially true regarding "the minutiae of the procurement process" where procurement officials are making discretionary determinations. *Id.* The Court must afford the agency "even greater" deference when reviewing a technical evaluation. *L-3 Commc'ns EOTech, Inc.*, 83 Fed. Cl. at 650. Here, the Solicitation stated a strength was "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." (AR 460). When evaluating the proposals, the Air Force determined that although Systems Implementers provided a "more detailed approach" to the hypothetical scenario, this was not more advantageous to the Government. (AR 9909). Specifically, the Comprehensive Analysis Report ("CAR") explained that the scenario's requirements "guided" all three offerors to "the same or similar end states." (*Id.*). Accordingly, there was little differentiation between the offerors. (*Id.*).

The agency is required to articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). The Court's role is to determine whether the agency's explanation of its exercise of discretion was both coherent and reasonable. *Impresa Construzioni*, 238 F.3d at 1332–33. Therefore, disappointed bidders must meet a heavy burden to show the decision lacked a rational basis. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1351 (Fed. Cir. 2013) (internal citation omitted). To challenge a best-value determination, specifically, the protester must offer more than mere disagreements with the agency's overall assessment of the adequacy of different proposals. *Banknote Corp. of Am., Inc.*, 56 Fed. Cl. at 384.

Here, OM Group, Systems Implementers, and Transcend each received Acceptable/Low Risk ratings for their solutions under Subfactor 1. (AR 9906–07). Within these ratings, the Air Force distinguished between the proposals. For example, OM Group received two weaknesses

that the Air Force believed were "likely to be correctable with normal Government monitoring . . . ." (AR 9906). More specifically, OM Group's proposal failed to account for "server racks (housing), cabling and power components to support a [Continuity of Operations/Portable Operating Datacenter] environment" and was not as detailed as the Air Force "would have liked to see." (AR 9907). For its part, Systems Implementers had a single weakness that the Air Force determined "would likely be corrected by normal Government oversight/monitoring." (AR 9907).[7] Systems Implementers' weakness involved the "incorrect sequencing of tasks" for the project schedule's Work Breakdown Structure. (AR 9908).

The Air Force's rationale for each offeror rating is reasonable and coherent. *See Impresa Construzioni*, 238 F.3d at 1332–33. It reflects a considered assessment of each proposal's adequacy and the final determination that these minor weaknesses warranted the same Acceptable/Low Risk ratings. Merely adding detail to an explanation does not warrant a strength award. Therefore, the Air Force's evaluation of Subfactor 1 was not arbitrary or capricious, an abuse of discretion, or otherwise contrary to applicable law or regulation.

## C.  *Systems Implementers has standing.*

To possess standing to bring a bid protest, a plaintiff must be an "interested party," or "an actual or prospective bidder" who possesses a "direct economic interest" in the procurement. *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018). "In a post-award bid protest, the relevant inquiry is whether the bidder had a 'substantial chance' of winning the award." *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1345 (Fed. Cir. 2020) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). The protestor must establish "not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Id.*

OM Group argues that Systems Implementers lacks standing to bring this bid protest. (Int.-Def.'s xMJAR at 12–17). Specifically, it asserts that even if Systems Implementers succeeds on the substantive merits, it does not have a substantial chance of award because its bid was approximately $30 million more than Transcend's bid. (*Id.* at 36; AR 9923). Systems Implementers contends that if a combination of its arguments regarding Subfactors 1 and 3 succeed, then it necessarily meets the substantial chance standard. (Pl.'s Repl. at 30–31).[8]

Here, Systems Implementers was one of four offerors considered by the Air Force. (AR 9906–30 (providing comparative analysis between four offerors)). In the Solicitation, the Air Force provided that the evaluation of the Technical Factor and its five subfactors was "significantly more important than price." (AR 460). Further, the CO determined that Systems Implementers' proposal was "awardable, affordable and executable[.]" (AR 12674). Its proposal was ultimately rejected because OM Group's and Transcend's were less expensive and more highly rated. (*Id.*). But for the Air Force's emphasis on modernization and innovative

---

[7] Transcend received no strengths or weaknesses under Subfactor 1.

[8] The United States does not address this argument in its briefing. (*See* Def.'s xMJAR; Def's Repl.).

technologies, Systems Implementers—one of four offerors whose proposal was "awardable"—had a substantial chance of winning the contract. Therefore, the Court determines that Systems Implementers has standing to bring this bid protest.

### D. Systems Implementers failed to satisfy the requirements for relief.

Systems Implementers also seeks as relief a permanent injunction requiring the Air Force to reevaluate proposals, stop OM Group's performance of the contract, and terminate the award to OM Group. (Pl.'s MJAR at 1–2). For the Court to grant injunctive relief, the plaintiff must succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (discussing the four-part test for injunctive relief, including a determination of whether "the plaintiff has succeeded on the merits of the case"). Here, Systems Implementers has not succeeded on the merits, so the Court is unable to award injunctive relief and need not analyze the remaining factors for injunctive relief. *Int'l Res. Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 164 (2005) ("A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief.").

## III.    Conclusion

Accordingly, the Court **DENIES** Systems Implementers' Motion for Judgment on the Administrative Record, (ECF No. 40), and **GRANTS** the United States' and OM Group's Cross-Motions for Judgment on the Administrative Record. (ECF Nos. 42, 43).

The parties shall meet and confer and file a joint status report proposing redactions to the memorandum opinion by **November 14, 2022,** to allow the Court to file a public version of the opinion.

The Clerk is **DIRECTED** to enter judgment for Defendants. Each party shall bear their own costs.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge